FILED
2005 Sep-09  AM 11:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ANGELIKA BREDEN,<br>PLAINTIFF, | ]<br>]<br>]<br>] |
| v. | ]Case No. CV-01-VEH-2961-NE<br>]<br>] |
| DILLARD'S INC.,<br>DEFENDANT. | ]<br>]<br>] |

## Opinion

This Court has before it the October 30, 2002, motion of Defendant Dillard's, Inc.

("Dillard's") for summary judgment as to Plaintiff Angelika Breden's claims.  (Doc. 20)

## I.  Procedural History

Plaintiff Angelika Breden commenced this action on November 11, 2001, by

filing a complaint in this Court alleging violations of Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Age Discrimination in

Employment Act, 29 U.S.C. §621, et seq., and the laws of the State of Alabama,

specifically, the Alabama Age Discrimination in Employment Act.  Plaintiff Breden

alleges in her complaint that she was subjected to a hostile work environment based

1

on national origin, age, and gender. Plaintiff Breden also alleges that she was subjected to disparate treatment in work assignments and ultimately discharged based on age, national origin and gender. Plaintiff contends that when she exercised her statutory rights by complaining to Defendant Dillard's regarding the alleged discrimination based on age, national origin, and gender, she was subjected to retaliation. In addition, Plaintiff Breden alleges that the Defendant was negligent in the hiring, training, supervision, and retention of Defendant's employees because it failed to discipline or terminate those employees who actively harassed and conspired against Plaintiff Breden on an ongoing basis, and failed to protect Plaintiff from further disparate treatment. Further, Plaintiff contends that the Defendant is liable for defamation because, subsequent to Plaintiff's termination, Plaintiff's co-workers were instructed to write negative statements about Plaintiff in order to deter third parties from associating with Plaintiff or hiring Plaintiff for employment and to harm her reputation.

On October 30, 2002, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Breden has failed to establish prima facie cases of hostile work environment, disparate treatment, and retaliation; (2) that the Defendant is entitled to summary judgment as to Plaintiff's Title VII claims of hostile work environment on the grounds that it has invoked affirmative defenses; (3) that even if Plaintiff Breden has established a prima facie case as to her retaliation claim, Plaintiff Breden has failed to rebut the Defendant's legitimate, non-discriminatory,

and non-retaliatory reasons for its employment decision; (4) that Plaintiff Breden has

no evidence to satisfy the elements required to establish a claim of defamation; and

(5) that Plaintiff Breden has no evidence to prove a claim of negligent hiring,

training, supervision, and retention.

The Defendant has submitted evidence[1] in support of its motion for summary

judgment and filed a supporting brief on October 30, 2002. On December 9, 2002,

the Plaintiff filed a brief and evidence in opposition to the Defendant's motion for

summary judgment.  The Defendant filed a reply brief on December 23, 2002.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrate

---

[1] The Defendant submitted the depositions of Plaintiff Angelika Breden, Steve Moretti, Mary Davis. The Defendant also submitted declarations by Roderick Sims, Aimee Parish, and Brian Ganus.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number of the deposition transcripts being referenced.

the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving party

to go beyond the pleadings and by his own affidavits, or by the depositions, answers

to interrogatories, and admissions of file, designate specific facts showing that there

is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are

irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences

are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick

v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is

merely colorable, or is not significantly probative, summary judgment may be

granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its

initial burden depends on whether that party bears the burden of proof on the issue

at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of

Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears

the burden of proof at trial, then it can only meet its initial burden on summary

judgment by coming forward with positive evidence demonstrating the absence of

a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict

if not controverted at trial. <u>Fitzpatrick</u>, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based

on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[2]

1.    Angelika Breden is a 48-year old German female who speaks with a heavy German accent.  (Plf.'s Affidavit ¶ 1; See also Def.'s Brief, Statement of Facts, ¶ 1).

2.    Breden began her employment with Dillard's as an hourly sales associate in the Accessories Department in March of 1999, (Compl. ¶11; Breden depo., pp. 53-54) and was terminated on February 23, 2001, by Steve Moretti, store manager.  (Moretti depo., p.145).

3.    Each Dillard's store does not have a human resource department or person. These matters are handled by the store manager, Moretti.  There is no corporate human resource department.  If a problem arises, the employee must call the direct supervisor or the legal department.  Moretti has been employed with Dillard's for ten and a half years and has never received any training from Dillard's on Equal Employment Opportunity or anti-discrimination policies.  (Moretti Depo., pp. 45-47).

---

[2] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.  Facts are undisputed unless otherwise expressly noted.

4.    Breden asked to be reassigned from accessories because of the unfair treatment she received. Jeanette Sornsin, her supervisor in the Accessories department, did not talk to her and when she did, she fussed at her without cause or responded with "snappy answers." Breden asked to be trained like everyone else on how to do inventory and her request was rejected. (Breden depo., pp. 56-58; 84-86). Inventory training was mandatory. (Birdyshaw Aff.¶ 14).

5.    Breden talked to Mary Davis, assistant store manager, about Sornsin's treatment of her and told Davis that she wanted to be treated fairly. (Breden Depo. at 56-57; Davis Depo. at 23-24). Although Davis did not think that Breden was being treated unfairly, she agreed to Breden's request for a transfer to another department. (Breden Dep. 155,156; Breden Depo. at 57).

6.    Davis accommodated Breden by allowing her to work in the children's department to make up her sales deficit from the accessories department. Once Breden's sales increased, she was transferred to the shoe department. (Birdyshaw Aff. ¶¶ 3-5).

7.    Carol Birdyshaw, a white female and Breden's initial supervisor in shoes, did not have a problem with Breden or her job performance. Birdyshaw found that Breden was never insubordinate or negative toward management, associates, or Dillard's in her presence. Additionally, Birdyshaw felt that Breden exemplified a positive attitude at all times while under Birdyshaw's

7

supervision.  Breden followed directions, was a hard worker, and was eager to take on assigned duties and tasks.  Birdyshaw never received any customer complaints about Breden, or any complaints  regarding issues between her and other associates.  Birdyshaw worked with Breden three to four months before she was transferred to another department.  (Birdyshaw Aff. ¶ 6).

8.    Birdyshaw was later replaced by Theodora Goggins ("Goggins"), a black female, a few months after Breden began working in the department.  (Davis Depo. at 25, 29-30; Breden Depo. at 247).

9.    Likewise, Goggins, Breden's second and last supervisor in shoes, testified that she did not have problems with Breden's job performance and did not know why Breden was terminated from Dillard's, other than Breden asking to see her personnel file.  (Goggins Aff. ¶ 5).

**Breden's complaints of discrimination**

10.    Breden complained that Moretti, the store manager would not listen to her when she tried to discuss with him her complaints of unfair treatment in the workplace.  Moretti directed her co-workers to write fabricated statements about her.  On one occasion Moretti banged his head against the wall while Breden attempted to talk to him causing Breden to fear for her own safety. (Breden depo., pp. 21-22).

11.    On this occasion, Breden had inquired to the store secretary, Ina McNutt, about her vacation leave.  Moretti charged out of his office and demanded that

Breden meet immediately in his office, told her that she did not seem to get it in her head, and proceeded to bang his head against the wall.  (Breden depo., pp. 36-37).

12.   On another occasion Breden went again to the secretary to inquire whether she had been credited with a certain sale. After the sales were announced that morning, Breden suspected the sale had been given to a co-worker.[3]  Breden was later told that Goggins, the supervisor, had taken one of her sales and given the sale to a co-worker.    The secretary explained that Breden would need to meet with Moretti on that issue.  Breden explained that she could not talk to Moretti, that he always yelled at her, and that she was afraid of him. The secretary then went and asked Moretti about the sale.  Moretti stormed out of his office and demanded that Breden immediately meet with Mary Davis, the assistant store manager, and him.  (Breden depo., pp. 38, 41-44).

**Goggins**

13.   When Breden was  assigned to the shoe department, she  was reassigned to work in  the Active Zone shoe department.  However, she was primarily told to sit in the stock room and sort tennis shoes, until called by someone to wait on a customer.  (Breden depo., pp. 66-68).

14.   Amy Beddingfield, a co-worker of Breden, worked with her from October

_____

[3]Only the sales for the top person in each department is announced.  (Breden depo., pp. 46-47).

1999 until July 2000.  Beddingfield provided a statement that Breden was the subject of mistreatment at Dillard's.  Beddingfield described Breden as one of the most productive and hardworking sales associates who genuinely cared about Dillard's as a company and about the customers.  She further stated that Breden never spoke negatively about Dillard's or about any of her superiors.  (Def.'s Ex. 11, page 1).

15.    Beddingfield also addressed that she felt Breden was made to do more than any other worker; that Breden spent more time in the stock room; and that her hours in the stock room were not "coded" so as to not count against Breden's "sales per hour" requirement (SPH).[4]  (Breden depo., pp. 48-50, 77).  Since Breden was working so much in the stock room and was not allowed to sell merchandise, she ended up in the deficit and her hourly pay was cut from $9.35 to $7.75 an hour.  (Breden depo., pp. 75-76).  Beddingfield also testified that, prior to Breden's termination, she was coaxed into making verbal and written complaints about [Breden] by [their] supervisor.  (Pl.'s Ex. 10).

16.    Breden and another German co-worker were called in on a Sunday morning to work at 7:45 a.m.  They were the only two individuals in the entire store

---

[4] Breden also saw that Goggins was coding hours for her co-workers that Breden was not receiving.  (Breden depo., pp. 51-52, 71).

called in to work.  (Breden depo., pp.78-80, 247-248).  Though it was an alleged scheduling error by Goggins, she never apologized.  (Breden depo., pp. 247-248).

17.   On another occasion, after Breden was delayed in signing a note that Goggins had provided, Goggins asked Breden in a sarcastic tone if she could read the English language(Breden depo., pp. 81-83; Breden Aff. ¶ 5).

18.   Roderick "Dion" Sims testified that he was forced to write a letter against Ms. Breden after her termination.  He further stated Breden was an outstanding worker, but often misunderstood, and that Breden never gave a negative opinion toward the company.  (Pl.'s Ex. 9).

19.   Additionally, Carlos Foley declared that Breden was a positive worker and the workplace was very positive when he worked with Breden.  He further stated that, approximately two weeks after Breden was fired, he and his co-workers were asked to write false and negative statements about Plaintiff Breden and he was pressured to do so by Goggins.  In fact, he stated that he could not leave that night until he wrote a letter against Ms. Breden and was forced to do so against his will.  Foley further stated that almost every day he was asked by Goggins about Breden and felt there was a conspiracy against Breden. (Pl.'s Ex. 11).

20.   Goggins would call in certain younger and non-German individuals to open

up the department early so they could get a jump on sales while Breden would be called in later. (Breden depo., pp. 101, 103).

21. These individuals were always younger. Specifically, Goggins chose Eric Atkins, a black individual who is half of Breden's age, to open the department early. Goggins also took Atkins on secret or mystery shopping trips and coded his hours so his sales per hour would not be adversely affected. (Breden depo., pp. 99-104).

22. Moretti testified that Goggins was required to always take a male with her to secret shop other locations. Male associates accompanied female supervisors and female associates accompanied male supervisors on secret or mystery shopping trips. (Moretti depo., pp. 166-167).

23. It was normal for all associates in shoes to do at least one hour of stock work every day, but Breden was required to do more than an hour every day. In fact, 80 percent of her time was spent in the stockroom. (Breden depo., pp. 106-108).

24. Saturdays were major sale days and, usually, busy days because an advertisement would run in the paper the day before. As a result, Saturdays were great days to work at increasing sales. Breden was often required to work in the stock room on major sale days. On one particular Saturday, Breden was told to work in the stockroom and another sales person, who was

off that day, was called in to come cover the floor.   The co-worker that was called in had to bring her children to work with her.  (Breden depo., pp. 165-167).

25.   Breden was scheduled to work four hour shifts a day, while her co-workers were working ten and twelve hour shifts.  Breden asked Goggins to let her work more than four hours a day because she had a long way to travel and needed to make her gas money.   Breden still received four hour shifts. (Breden depo., pp. 171-172).

26.   Goggins moved Breden from men's to women's shoes because she had heard that Breden was complaining.   Breden denied that she was complaining. When Breden told Goggins that she did not like to work in women's shoes, Goggins told her that she could leave (quit).   She did not make other associates leave men's to go work in women's shoes.  (Breden depo., pp. 157-160).

27.   On rare occasions when Breden would ask Goggins whether or not she had been credited with a sale, Goggins would tell her that she would check into it, but would never get back to Breden, or would totally ignore her about her request.  (Breden depo., p. 225).

28.   On February 10, 2001, Breden recalls that there were five people in the department and, one by one, everyone was called to Moretti's office  except

13

her.  This is the date some of the statements were signed by her co-workers reflecting her in a negative and false light.  (Breden depo., pp. 230-231).

29.    Breden admits that she often raised customer service related problems when these matters were brought to her attention by customers.  Goggins would not pay attention if Breden asked her questions pertaining to such customer service related matters.  Therefore, Breden brought these matters to Davis's and Morrerro's attention and later Moretti's.  (Breden depo., pp. 237-238).

30.    Moretti recalled that one customer complained about Breden.  He did not address the matter with Breden, but did to Goggins, Breden's supervisor.[5] (Moretti  depo., pp. 49).

31.    Moretti states he terminated Breden because she continued to make negative comments about the company, its managers and associates; there was constant turmoil in the department she worked in; and she could not let go of the past. Additionally, Moretti states he fired Breden because she did not follow the ten steps to selling.[6]   (Moretti  depo., p.67).

32.    Goggins states that on February 23, 2001, Breden came to her and asked to

---

[5]Moretti's policy was to not just take the customer's word about a complaint because there are always two sides to every story.  It could be the customer's issue and not the associate's issue.  He would have placed a note about the matter in Breden's file.   (Moretti depo., p.51).

[6]Moretti states he had talked to Breden about the ten steps to selling in the past but had never documented the fact in writing or disciplined Breden about this previously.   (Moretti depo., p.77).  Moretti has never fired anyone else for not following the ten steps to selling. (Moretti depo., p. 101).

see her personnel file to review for any customer complaints.  She reported the request to Moretti, who became very hostile, asked her to send Breden to his office immediately, proceeded to tell Breden that her personnel file was none of her business and then terminated her on the spot.  Goggins believes Breden's termination was unjustified.  Breden's termination had not been discussed with Goggins prior to Moretti firing Breden.  (Goggins Aff.  ¶¶ 4 & 5).

33.    Moretti states he first disciplined Breden for violation of work rule number ten (having a positive attitude about your job) in early January 2001.   The second time was when he terminated her on February 23, 2001. (Moretti depo., pp.77-78).  Moretti arrived at this store in October 2000; he orally reprimanded Breden in November and December about work rule number ten; in January 2001 he issued the first written warning to Breden and the next month terminated her.  (Moretti depo., pp.78-80).

34.    Moretti states, that, prior to Breden's termination, he received three letters from co-workers basically all stating the same exact comments and how negative Breden is in the workplace.  Moretti did not think it was odd that the three statements said the same thing.  (Moretti depo., p.138).  Later these same individuals retracted their statements and stated they were told to write negative statements about Breden only <u>after</u> her termination.  (See Moretti

depo., p. 159 and Pl.'s Exs. 9-11).

35.    Davis, assistant store manager at the time Breden was employed, testified that

all of Breden's supervisors had complained about her, including Birdyshaw

who said that Breden had a terrible attitude and was hard to work with.

(Davis depo., pp. 19-20).  However, Birdyshaw testified that "Breden also

exemplified a positive attitude at all times while under my supervision.  She

followed directions, was a hard worker, and was eager to take on assigned

duties and tasks."  (Birdyshaw Aff.¶ 6).

36.    Davis states she also had problems with Breden's not following the ten steps

to selling, but when asked what they were she could not remember the steps.

Davis agrees that she would not terminate an associate for not following these

steps.  (Davis depo., pp. 31-32, 44).

37.    Davis admits that in February 2000, Breden's pay was cut[7], though when

Davis looked month by month, Breden was at the department average or one

of the top two sellers in the department.  Breden's "ability to sell was never

a question," but he believes that, had Breden used the ten steps to selling, she

would have done better than she was doing.  (Davis depo., pp. 41-44).

38.    Even though Breden had exceeded her selling goals, her standard was 97 and

---

[7] Her pay was cut after being told that she could make great commissions in the active zone.  (Breden depo., pp. 269-170, 272).  Breden's pay was cut even though she had the highest sales and the lowest hourly rate.  (Breden depo., p. 276).

her actual average SPH was 109 over her standard.  (Davis depo., p. 75).

39.    In February 2000, Breden was the top seller.  (Davis depo., pp. 44-45).

40.    In March 2000, Breden again had the highest net sales and the second highest SPH.  (Davis depo., p. 47).

41.    Breden was the top seller in May 2000, June 2000, and July 2000 and was the second highest seller when she was edged out by Mr. Foley by $200.  (Davis depo., p. 48).

42.    Breden was on vacation the month of August 2000 and was back at work in September 2000 as the number one sales person.  In October 2000 she was again number one in net sales.  In November she was second place; and December and January again in the number one sales place. (Davis depo., pp. 45-50).

43.    Breden, per the annual sales report for fiscal year 2000, sold $224,000 in the department and had $128 in sales per hour ( a number that Moretti states "doesn't indicate really anything.").  Breden was the second highest in the department.  Moretti believes that those extremely high numbers do not indicate that Breden was following the ten steps to selling, she could have been the only one there in the store or just lucky.[8]  (Moretti  depo., pp.103-

---

[8]Prior to leaving the store, the previous store manager, Mr. Morrero, sent a note congratulating Breden for the highest SPH and the highest sales in the men's shoe department. (Moretti depo., p.170, Bredenibit 13).

105).

44. Often during lunchtime when men would come in to buy shoes in the men's shoe department, Goggins would remove Breden from the shoe department and put her in the active zone area to prohibit her from selling.  (Breden depo., pp. 244-245).

45. Breden was picked on constantly by Goggins if she was off the time clock and sitting at the cosmetic counter.  Goggins would question her.  If she walked through the store on her day off in short sleeves, she was questioned by Goggins.  If she looked at shoes while on her break, she was questioned by Goggins.  She was accused by Goggins of customer complaints and when it was discovered it was not her, but another associate, Goggins would not apologize, but would tell her if it happened again, Breden would be fired. (Breden depo., pp. 245-246).

46. Goggins would tell associates when they were going to be mystery shopped, but would not tell Breden.  (Breden depo., pp. 281-284).

47. There was a mandatory video that the associates had to watch and everyone else was given special hours but Breden.  (Breden depo., pp. 287-289).

48. Breden tried to complain to Moretti, but he would ignore her and tell her he was busy.  She would call and slip notes under his door that she needed to talk with him, but he would not call her back.  (Breden depo., pp. 293-294).

49.   She saw a co-worker's paystub and noted that he was making more per hour than she was and she had been there longer with higher sales.  (Breden depo., pp. 292-294).

50.   Moretti obtained certain statements from co-workers, dated 2-10-01, prior to the termination of Breden or at least he states they were provided to Goggins on that date.  (See Moretti depo., Breden Exhibit 6).  However, Goggins states she was told to obtain these statements by Moretti right before Breden's appeal hearing.  (Goggins Aff. ¶ 6).  At the appeal hearing, Moretti testified, under oath, that "I also have statements from four different associates about her negative behavior patterns...I had just received another complaint from another associate and it was the end of the straw.  We could not continue to go on.  She was a total destruction to our business."  (Pl.'s Ex. 7, p. 4).

51.    It is undisputed that, on one occasion, Moretti inappropriately massaged Breden's shoulders when she was alone in the stockroom and her back was turned.  The touching lasted more than a few seconds.  (Moretti depo., pp.177-181).

**Breden complaints to management**

52.   Breden met with store manager, Steve Moretti, about the alleged unfair

treatment she was receiving at Dillard's, on at least five different occasions[9] from the time he was hired in October 2000 until Breden was discharged in February 2001. (Breden depo., pp. 28, 210). Breden also complained that her pay had been cut. (Moretti depo., p.87).

53.    Moretti is one of the people designated to receive complaints of harassment or discrimination. (Moretti depo., p.181).

54.    Moretti did not consider Breden's complaints because, in his opinion, she was a habitual complainer. (Moretti depo., p.182).

55.    Breden also complained several times to the assistant store manager, Davis, that she was being treated unfairly and singled out. Davis told Breden, without conducting any type of investigation, that she was not being treated unfairly. (Breden depo., pp. 91-93).

56.    Breden also called the District Manager's office in Nashville, Tennessee and spoke to the secretary. Breden conveyed her concerns that she was being treated unfairly. The secretary told Breden the store was going to receive a new store manager (Moretti) and that Breden should wait until then to voice her complaints. (Breden depo., p. 30). Davis thereafter called the same secretary and, without hearing Breden's version, explained that Breden was

---

[9]Moretti's version is that Breden complained weekly to him about the workplace. (Moretti depo., p. 69). Moretti states in the position statement to the EEOC that he talked to Breden at least a dozen times. (Moretti depo., p.146).

complaining and had been caught by her supervisor.  (Breden depo., pp. 93-98; 198-199).

57.   The harassment policy reflected that Breden could complain to her supervisor or the store manager, or call the corporate counsel's office.  Breden made the decision not to go further after she called Nashville and nothing happened. (Breden depo., pp. 216-217).

58.   Davis never asked Breden to put any of her complaints in writing because they were not specific, though she always took Breden seriously.  (Davis depo., p. 81).

59.   However, Davis did feel that there was one specific incident where Breden informed her about Goggins approaching her improperly regarding a conversation Breden was having with another associate.  Davis did not have her write a statement on this occasion.  (Davis depo., p. 82-83). Davis told Breden the manager had acted appropriately and Breden called the District Manager.  Davis knows that Breden called the District Manager because the District Manager's secretary called her about Breden's complaint. Thereafter, Davis went to the manager, asked what happened, and determined the manager acted appropriately.  (Davis depo, p. 83).

60.   Davis recalls that Breden was in her office on several occasions crying about

what had been done to her in the workplace.[10]  (Davis depo., p. 62).

61.  Davis states the complaint procedure for an associate is to go to their immediate supervisor and, if the issue is unresolved, then to come to her or the store manager.  She did not find fault in how Breden exercised the option to come to her or Moretti when she had a complaint and believes Breden followed the proper procedure.  (Davis depo., p. 98).

62.  Store policy dictated that any complaint would be discussed orally with [the complainant] and then put in writing for [the complainant] to read and sign. The complainant could refuse to sign any writing.  (Moretti depo., p. 22).

**Severity of the Harassment/Discrimination**

63.  Breden  was very stressed at work and would try to talk to her manager about what was going on.  (Breden depo., pp. 117-118).

64.  Breden states she was devastated at being fired.  She had never been fired in her life and was simply trying to make a living after her divorce.  (Breden depo., p. 127).

65.  She was upset, couldn't sleep, had to talk to friends almost every day, and became a different person.  She was depressed while being treated unfairly

---

[10]  While helping a customer, Goggins ordered Breden to leave the department and go straighten out a mess in the women's department.  This happened on more than one occasion that Goggins interrupted Breden servicing a client to only go straighten out someone else's mess. (Breden depo., pp. 242-243).

and after her termination.  (Breden depo., pp. 127-128).

66.    Breden could not sleep and had stomach problems while being harassed.
       After being fired, Breden did not believe in herself and felt useless.  (Breden
       depo., p. 129).

## IV.  Applicable Substantive Law and Analysis

### A.  Hostile Work Environment

Plaintiff Breden alleges that Dillard's subjected her to a hostile work
environment based on age, national origin, and gender.  A hostile work environment
claim under Title VII is established upon proof that the workplace is permeated with
discriminatory intimidation, ridicule, and insult that is sufficiently severe or
pervasive to alter the conditions of the victim's employment and create an abusive
working environment.   Civil Rights Act of 1964, §701 et seq.  as amended, 42
U.S.C.A. §2000 et seq.  To establish a hostile work environment claim, an employee
must show: (1) that [s]he belongs to a protected group; (2) that [s]he has been
subject to unwelcome  harassment; (3) that the harassment must have been based on
a protected characteristic of the employee, such as national origin; (4) that the
harassment was sufficiently severe or pervasive to alter the terms and conditions of
employment and create a discriminatorily abusive working environment; and (5) that
the employer is responsible for such environment under a theory of vicarious or of
direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir.

2002).

## 1. __National Origin__

It is undisputed that Breden belongs to a protected group; she's German. Breden alleges that she was subjected to unwelcome harassment and such harassment included but was not limited to false claims of Breden complaining to another employee, false claims of a customer complaint against Breden, false accusations of Breden being tardy more than once (in violation of Associate Work Rule #2), all of which are grounds for disciplinary action, including dismissal from employment, under one or more of Dillard's policies. (Breden depo., pp. 93-98, 202-203.)   In addition, Breden alleges that she was subjected to other forms of harassment, including but not limited to, Goggins's following Breden around and questioning her, derogatory remarks from Goggins,[11] Goggins's adverse scheduling of Breden,[12] and Goggins's requiring Breden to work in the stock room more than other hourly employees.  (Breden depo., pp. 47-48, 79-80, 81-83, 245-246, 248.)

Even though Plaintiff Breden has provided evidence that she was subject to unwelcome harassment, she must establish that the harassment was based on her

---

[11] On one occasion, Goggins asked Breden if she could read English when Breden was hesitant in signing some notes provided to Breden by Goggins.  (Breden depo., pp. 81-83)

[12] Goggins would often schedule Breden, a commissioned employee, to work during non-sales hours, and she would schedule Breden to work in areas with historically low sales, such as the Active Zone and the men's department, during day-time hours. ( Breden depo., pp. 79-80,124, 244).

national origin.  Breden provided evidence that Beddingfield, a co-worker, told Breden that her supervisor, Goggins, does not like Germans. (Breden depo., pp. 78; 248.) Second, Breden provided evidence that  Goggins asked Breden if she could read English when she provided Breden with some notes to sign. (Breden depo., pp. 81-83). Third, Breden and another German employee were the only two sales associates  scheduled by Goggins to work at 7:45 a.m. on a Sunday, during hours that the store was not open to the public. (Breden depo., pp. 79-80; 248).

The Court finds that the evidence provided by Breden that Goggins did not like Germans is grounded on inadmissible hearsay.  Even assuming, however that the statement made by Beddingfield to Breden is admissible, the Court finds that Breden has not provided sufficient evidence to establish that the alleged harassment was based on Breden's national origin.  First, Breden admits that she does not know if Goggins's comment referred to Breden's German background. (Breden depo., pp. 79-80.) Second, the evidence provided by Breden is not sufficiently severe or pervasive to alter the terms and conditions of Breden's employment.

Determining the existence of unlawful harassing conduct involves both a subjective and an objective analysis.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  The employee must subjectively perceive the harassment to be sufficiently severe or pervasive to alter the terms and conditions of employment, and the employee's subjective perception must be objectively reasonable.  In analyzing

whether the employee's perception is objectively reasonable, courts consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Id. at 23.

The totality of Plaintiff Breden's evidence of harassment does not support a finding of a hostile work environment.  The comments and actions attributable to Goggins and Moretti were neither frequent nor severe in content or nature.  The conduct was not physically threatening or humiliating and it did not interfere with Plaintiff Breden's job performance.  The only action that occurred frequently was Plaintiff Breden being assigned to the Active Zone and to the stock room.  However, this conduct was not severe, physically threatening, or humiliating.  The only evidence that Plaintiff Breden has that may rise to the requisite level of severity is the incident in which Plaintiff Breden claims that Moretti banged his head against the wall and scared her.  However, this single incident alone is not sufficient to sustain a hostile work environment claim based on national origin.  Accordingly, the Court finds that Plaintiff Breden has not provided sufficient evidence to establish a prima facie case of a hostile work environment based on national origin.  The Defendant's motion for summary judgment is due to be granted as to this claim.

2. **Age**

It is undisputed that Plaintiff Breden belongs to a protected group; she's forty-five years old.  Plaintiff Breden alleges that she was subjected to unwelcome harassment and such harassment included but was not limited to repeated intimidation and hostility from her immediate supervisor, Goggins, and store manager, Moretti.  Plaintiff Breden alleges that Goggins would follow her around and question her and subject Plaintiff Breden to derogatory remarks.[13]  Further, Plaintiff Breden alleges that Goggins would subject Plaintiff Breden to adverse scheduling[14] and task assignments.  Plaintiff alleges that Moretti, the store manager, would not listen to her when she tried to discuss with him her complaints of unfair treatment in the workplace and that he directed her co-workers to write fabricated statements about her.  On one occasion, Moretti banged his head against the wall while Breden attempted to talk to him causing, Breden to fear for her own safety. (Breden depo., pp. 21-22).  Plaintiff asserts that Moretti and Goggins did not subject younger and less experienced co-workers to the same terms and conditions as

[13] On one occasion, Goggins asked Breden if she could read English when Breden was hesitant in signing a form provided to Breden by Goggins.  (Breden depo., pp. 81-83)

[14] Goggins would often schedule Breden, a commissioned employee, to work during non-sales hours, and she would schedule Breden to work in areas with historically low sales, such as the Active Zone and the men's department, during day-time hours. ( Breden depo., pp. 79-80,124, 244).  Plaintiff Breden asserts that younger and less experienced co-workers were given better schedules and assigned to areas with higher sales.  Id.  In addition, Goggins required Breden to work in the stock room more than other hourly employees.  (Breden depo., pp. 47-48, 79-80, 81-83, 245-246, 248).

Plaintiff Breden.

Although Plaintiff Breden has provided evidence that she was subject to unwelcome harassment, she must establish that the harassment was based on her age.  Upon review of the record, the Court finds that Plaintiff Breden has not provided sufficient evidence that she was subjected to a hostile work environment based on age.  Further, even assuming however that Plaintiff Breden has proved that the alleged harassment was based on age, the Court finds that Plaintiff Breden has not provided sufficient evidence that the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.  Accordingly, the Court finds that Breden has not proved a prima facie case of hostile work environment based on age and the Defendant's motion for summary judgment as to Plaintiff Breden's hostile work environment claim based on age is due to be granted.

3. **Gender**

It is undisputed that Plaintiff  Breden belongs to a protected group; she's a female.   Plaintiff alleges that Defendant Dillard's subjected her to unwelcome harassment and that such harassment was based on her gender.  It is undisputed that, on one occasion,  Moretti inappropriately massaged Plaintiff Breden's shoulders when she was alone in the stockroom and her back was turned. (Moretti depo., pp.177-181.) The  touching lasted more than a few seconds.  Id.  Plaintiff Breden asserts that when she refused to acquiesce to Moretti's actions, subsequent to this

incident, Moretti repeatedly ridiculed and subjected Plaintiff Breden to a hostile work environment.  Plaintiff Breden alleges that Moretti, the store manager, would not listen to her when she tried to discuss with him her complaints of unfair treatment  in the workplace including, but not limited to, adverse scheduling and assignments.  Plaintiff also alleges that Moretti directed her co-workers to write fabricated statements about  her.  Further, on one occasion Moretti banged his head against the wall while Breden attempted to talk to him, causing Plaintiff Breden to fear for her safety.  (Breden depo., pp. 21-22).

Plaintiff Breden must provide sufficient evidence to demonstrate that the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of her employment; See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000); Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1280 (11th Cir. 2003); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  As noted above, determining the existence of unlawful harassing conduct involves both a subjective and an objective analysis.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  In analyzing whether the employee's perception is objectively reasonable, courts consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Id. at 23.

29

Plaintiff Breden has provided evidence of a single incident of gender based harassment.   Other than the shoulder massage Moretti performed on Plaintiff Breden, Plaintiff Breden has not provided any evidence that Moretti ever made any sexually offensive comments to Breden or took any sexually offensive action towards her.   In addition to Moretti subjecting Plaintiff Breden to a shoulder massage, Plaintiff Breden alleges that after she rejected Moretti's alleged sexual advance, Moretti would not listen to her when she tried to discuss with him her complaints of unfair treatment in the workplace, he called her lazy on one occasion, and he banged his head against the wall during a conversation with her.

In Gupta v. Florida Bd. of Regents, 212 F. 3d 571 (11th Cir. 2000), cert. denied, 531 U.S. 706 (2001), the Eleventh Circuit Court of Appeals rejected a claim in which the plaintiff alleged that over a six-month period her superior called her at home two to three times a week and asked her personal questions, stared at her legs when she wore a skirt cut above the knee, touched the inside of her thigh, touched her ring and bracelet, unbuckled his pants and pulled down his zipper to tuck in his shirt in front of her, lifted the hem of her dress, and suggested that he should spend the night with her.  Id. at 578-79.  The court concluded that these actions did not rise to the level of actionable sexual harassment.  Id. at 586.

Upon review of the record, Plaintiff Breden's evidence of harassment does not support a finding of a hostile work environment based on gender.  The Court finds

30

that Plaintiff Breden has not provided sufficient evidence that the alleged harassment was frequent, severe, physically threatening, humiliating, or unreasonably interfered with her job performance.  Accordingly, the Court finds that Breden has not proved a prima facie case of hostile work environment based on gender and the Defendant's motion for summary judgment as to Plaintiff Breden's hostile work environment claim based on gender is due to be granted.

## B. Disparate Treatment

Plaintiff Breden alleges that Dillard's discriminated against her by treating her differently in the terms and conditions of her employment than younger and non-German sales associates.  Plaintiff Breden alleges that Defendant Dillard's subjected her to disparate treatment based on age, gender,  and national origin by: (1) failing to code her non-sales work as "special"; (2) failing to adhere to her schedule requests; (3) failing to take her on secret shopping trips; (4) requiring Breden to work in the active zone and the women's shoe department; (5) failing to discipline other associates for arriving late or leaving early; (6) failing to provide business cards to Breden in a timely manner; (7) requiring Breden to maintain a clientele book; (8) failing to provide Breden with training for inventory; (9) requiring Plaintiff Breden to work in the stock room more than other associates; and (10) ultimately discharging Plaintiff Breden.

1. **Age**

Plaintiff Breden alleges that younger and less experienced co-workers were not subjected to the same disparate terms and conditions as Plaintiff Breden, including repeated intimidation and hostility from Goggins and Moretti, adverse scheduling and task assignments, disciplinary write-ups, wage reduction, and termination.

In evaluating age discrimination claims based on circumstantial evidence, a plaintiff must satisfy a prima facie case. The plaintiff must prove that: (1) she was a member of the protected group of persons between the ages of forty and seventy; (2) she was subject to adverse employment action; (3) a substantially younger person filled the position that she sought or from which she was discharged; and (4) she was qualified to do the job for which she was rejected. Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1358 (11th Cir. 1999). The Eleventh Circuit has "also held that a plaintiff establishes a prima facie case by showing that [s]he was suspended or fired while others not in plaintiff's protected class, 'having comparable or lesser qualifications', were retained." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984), citing Whitting v. Jackson State University, 616 F.2d 116, 121 (5th Cir. 1980).

Plaintiff Breden is a member of the protected group; she's over the age of forty. Plaintiff Breden alleges that she was subjected to several adverse employment actions, including but not limited to adverse scheduling and task assignments,

disciplinary write-ups, wage reduction, and ultimately her termination.  Plaintiff Breden provided evidence that she was scheduled to work four hour shifts a day, while her co-workers were working ten and twelve  hour shifts.  Plaintiff Breden asked Goggins to let her work more than four hours a day because she had a long way to travel and needed to make her gas money. (Breden depo., pp. 171-172).  The Court finds that Plaintiff Breden has not provided sufficient evidence to establish that the scheduling of Plaintiff Breden to work four hour shifts instead of ten or twelve hour shifts was an adverse employment action.  However, the Court finds that Plaintiff Breden provided sufficient evidence to establish that her subjection to numerous assignments in the inventory/stockroom, disciplinary write-ups, wage reduction and ultimately her termination constituted adverse employment actions.  Plaintiff Breden provided  evidence that it was normal for all associates in shoes to do at least one hour of stock work every day, but Breden was required to do more than an hour every day.  In fact, 80 percent of her time was spent in the stockroom. (Breden depo., pp. 106-108).  Plaintiff Breden was also often required to work in the stock room on Saturdays, which are major sale days.  In contrast to other associates, who occasionally worked in the stock room, Plaintiff Breden's hours in the stockroom were not coded as special hours to prevent negatively impacting Plaintiff

Breden's "sales per hour" requirement.[15]  Since Breden was working so much in the stock room and not allowed to sell merchandise, she ended up in the deficit and her hourly pay was cut from $9.35 to $7.75 and hour.  (Breden depo., pp. 75-76.)

Plaintiff Breden provided evidence that a substantially younger person filled the position that she sought or from which she was discharged.  Defendant Dillard's asserts that it cannot be held liable for age discrimination since it did not replace Plaintiff Breden immediately after her termination.  Although Defendant Dillard's replaced Breden two months after her discharge, Plaintiff Breden provided sufficient evidence to satisfy the third prong that the employees that covered Plaintiff Breden's hours after her termination were younger than Plaintiff Breden.

Once the plaintiff has established a prima facie case, the employer must proffer legitimate, non-discriminatory, and non-retaliatory reasons for its employment decision.  Defendant Dillard's asserts that every sales associate was required to do stock room work and the time was not coded as "special" but was considered in the required sales per hour established for each sales associate.  Hence, Defendant Dillard's decision to assign Plaintiff Breden, as well as other sales associates, to the stock room, was not based on discrimination.  Furthermore, Defendant Dillard's alleges that Plaintiff Breden was terminated because she

_____

[15] Goggins chose Eric Atkins, a black individual who is half of Breden's age, to open the department early.  Goggins also took Atkins on secret or mystery shopping trips and coded his hours so his sales per hour would not be hurt.  (Breden depo., pp. 99-104).

violated work rule ten by exhibiting an adversarial attitude towards her managers and co-employees which negatively impacted the operation of the Men's Shoe department.

Plaintiff Breden is required to prove by a preponderance of the evidence that Defendant Dillard's articulated reasons are merely a pretext for discrimination. Plaintiff Breden presented evidence that, prior to her termination, she was often the top sales associates, Goggins did not feel that Plaintiff Breden's termination was justified, and that co-employees were coaxed into writing untrue statements that negatively depicted Plaintiff Breden.  Further, Plaintiff Breden presented evidence that Defendant Dillard's retained other employees under the age of forty who complained (at least sometimes about Breden) and exhibited an adversarial attitude towards co-employees.  Although, the Court does not find that Plaintiff Breden has presented sufficient evidence that she was assigned to work in the stock room based on age, the Court finds that Plaintiff Breden has presented sufficient evidence to raise a genuine issue of material fact regarding Defendant Dillard's reasons for discharging Plaintiff Breden. Accordingly, the Defendant's motion for summary judgment as to Plaintiff's claim of discrimination based on age as to her termination is due to be denied.

2. **Gender**

Plaintiff alleges in her complaint that the Defendant intentionally

discriminated against her because of her gender.  Plaintiff Breden asserts that such discrimination included, but was not limited to, the Defendant's policy of requiring only males to secret shop other locations with Goggins, Moretti's banging his head against a wall in Breden's presence, Goggins's allegedly treating Breden differently than male employees by persistently harassing her as discussed above in Section A, and the Defendant's ultimately discharging her.  In order to establish a prima facie case of discrimination, the Plaintiff must establish that: "(1) she is a member of a protected class, (2) she was similarly situated with a person outside of the protected class, but (3) she was denied a condition of employment afforded that person." Thompson v. West, 833 F. Supp. 1502, 1509 (M.D. Ala. 1995) (citing Thompkins v. Morris Brown College, 752 F.2d 558, 562 n. 7 (11th Cir. 1985)).

It is undisputed that Plaintiff Breden is a member of a protected class; she's a female.  Besides identifying Atkins as an individual outside of the protected class that was similarly situated, she has not identified any other males that were treated more favorably than she was by the Defendant.  Even assuming, however, that Plaintiff Breden has satisfied the second element of the prima facie case, the Court finds that Plaintiff Breden has not provided sufficient evidence that the Defendant intentionally discriminated against her because of her gender and denied her a condition of employment.  Even though Plaintiff Breden provided evidence that the Defendant required only males to secret shop other locations with Goggins, the

36

Plaintiff has not established a prima facie case of disparate treatment.[16]  Accordingly, the Court finds that the Defendant's  motion for summary judgment as to Plaintiff Breden's disparate treatment claim based on gender is due to be granted.

3. **National Origin**

_____In the complaint, Plaintiff Breden alleges that she was subjected to discriminatory conduct and treated under different terms and conditions of her employment by the Defendant than her non-German co-workers.  Plaintiff Breden alleges that disparate treatment included, but was not limited to, the Defendant's coding the hours of  non-German salespersons for non-sales work, such as training or stock room work, as "special" so that those hours would not count against them in their sales per hour requirement, requiring Plaintiff Breden to work in the stock room more than her non-German co-workers, and ultimately discharging Plaintiff Breden.  In order to establish a prima facie case of discrimination, the plaintiff must satisfy a prima facie case by establishing that: "(1) she is a member of a protected class, (2) she was similarly situated with a person outside of the protected class, but (3) was denied a condition of employment afforded that person."  Thompson v. West, 833 F. Supp. 1502, 1509 (M.D. Ala. 1995) (citing Thompkins v. Morris

---

[16] The Plaintiff has not clearly alleged a claim of disparate impact based on gender as it relates to the Defendant's secret shopper policy.  However, to the extent that the Plaintiff alleges such claim, the Court finds that Plaintiff Breden has not provided sufficient evidence to establish that the Defendant's secret shopper policy requiring males to accompany Goggins on secret shopping trips to other locations  had a significant adverse impact upon women.

Brown College, 752 F.2d 558, 562 n. 7 (11th Cir. 1985)).

Plaintiff Breden is a member of a protected class; she's German.  Plaintiff Breden asserts that she was  treated under different terms and conditions of her employment than her non-German co-workers.[17]  Plaintiff Breden has identified Eric Atkins, a Black employee, as an employee similarly situated with Plaintiff and outside of the protected class.  While the Plaintiff has satisfied the first and second prongs of the prima facie case, the Court finds that the Plaintiff has failed to satisfy the third prong of the prima facie case, that she was denied a condition of employment afforded a co-worker outside of the protected class.  Plaintiff Breden has not provided sufficient evidence to establish that other sales associates non-sales hours were coded as "special" or that they were given higher pay for "special" hours. In addition, Plaintiff Breden has not provided sufficient evidence to establish that she worked in the stock room more than her non-German co-workers and ultimately was discharged because of her national origin.  Accordingly, the Court finds that the Defendant's motion for summary judgment as to Plaintiff Breden's disparate treatment claim based on national origin is due to be granted.

## C. **Retaliation Claim**

The Plaintiff alleges that, after she complained about unfair treatment,

---

[17] Plaintiff Breden alleges that Goggins, a Black supervisor,  treated Black employees more favorably than German employees.

including discrimination and harassment, to the Defendant, the Defendant retaliated against her by subjecting her to ongoing hostilities and ultimately discharging her. The Defendant asserts that: (1) Plaintiff Breden's complaints are not statutorily protected expressions, (2)  Plaintiff Breden fails to allege that she suffered an adverse employment action causally connected to any protected activity; and (3) all of the Defendant's proffered reasons for its employment decisions were taken for legitimate non-retaliatory reasons.

Generally, to establish a prima facie case of retaliation, a plaintiff must show: (1) that [she] engaged in protected activity; (2) that [her] employer was aware of that activity; (3) that [she] suffered an adverse employment action; and (4) that there was a causal link between [her] protected activity and the adverse employment action. Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  The allocation of the evidentiary burdens will be determined by whether the evidence for establishing the retaliation claim is characterized as "direct" or "circumstantial" evidence.

Plaintiff Breden alleges that she engaged in statutorily protected activity when

she complained to Davis and Moretti that Goggins treated her unfairly by subjecting her to adverse schedules, adverse work assignments, and harassment.  Upon review of the record, the Court finds that Plaintiff Breden has presented evidence that she complained to Davis and Moretti regarding customer related problems and general workplace issues, including her denied requests to Goggins to work evening shifts and  Goggins's placement of Plaintiff Breden in the active zone and stock room to work.  Plaintiff Breden has not provided sufficient evidence that she made internal complaints to the Defendant regarding discrimination or harassment.  Therefore, Plaintiff Breden has not established a prima facie case of retaliation by demonstrating that she engaged in statutorily protected activity.  Accordingly, the Defendant's motion for summary judgment as to Plaintiff Breden's retaliation claim should be granted.

### D. <u>State Law Claims</u>

1. <u>Defamation</u>

Breden alleges that Dillard's defamed her by soliciting negative statements from her co-workers "so as to lower [her reputation] in the estimation of the community or to deter third persons from associating with Plaintiff or from hiring her for employment.[18]"  Complaint at ¶ 81.  The elements of a cause of action for

---

[18]Under Alabama law, an employer can be held liable for an employee's tortuous conduct if the plaintiff demonstrates that (1) the employee's wrongful acts were committed in [his/her] line and scope of employment; or (2) that acts were committed in furtherance of the employer's

defamation are as follows: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence; and (4) either actionability of the statement irrespective of special harm (actionable per se) or the existence of special harm caused by the publication of the statement (actionable per quod).[19]  McCraig v. Talladega Publishing Co., 544 So.2d 875 (Ala. 1989).

"Words are defamatory per se if they directly tend to prejudice anyone in his office, profession, trade, or business, or in any lawful employment by which [s]he may gain [her] livelihood."  Kelly v. Arrington, 624 So. 2d 546, 549 (Ala. 1993). It is undisputed that the allegedly coaxed statements of Breden's co-workers' were false and directly tend to prejudice Breden's profession and/or trade because such statements concerned her job performance.  Therefore, the allegedly coaxed statements of the co-workers are defamatory *per se.*

"The issue of whether a communication is conditionally privileged is a question of law."  Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117 (Ala. 1976).

_____

business; or (3) that the employer participated in, authorized, or ratified wrongful acts.

[19] "Slander per se is actionable if it imputes to the plaintiff an indictable offense involving infamy or moral turpitude."  Anderton v. Gentry, 577 So.2d 1261, 1263 (Ala. 1991). "Slander per quod is a communication to a third person of a defamatory statement subjecting the plaintiff to disgrace, ridicule, odium, or contempt, although not imputing the commission of a crime involving infamy or moral turpitude."  Id.

Under Alabama law, the comments made by and between Dillard's employees about Breden's work are privileged.

> Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice.*** The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.

Willis v. Demopolis Nursing Home, Inc., 336 So. 2d 1117, 1120 (Ala. 1976) quoting Berry v. City of New York Ins. Co., 98 So. 290, 292 (Ala. 1923).

In the present case, Breden has provided no evidence that Dillard's published any of the statements it received from Breden's co-workers to a third party. Instead, Breden's evidence simply indicates that Moretti, Davis, and Goggins spoke with Breden's co-workers to ascertain their opinions and problems concerning Breden's work behavior. Since these managers have an interest in the operation of the Men's Shoe department and they were speaking to Breden's co-workers, who have a corresponding interest in the department's operation, whatever disparaging comments Breden believes these managers made to her co-workers are conditionally privileged unless Breden can prove "actual malice." Kirby v. Williamson Oil Co., 510 So. 2d 176, 178-79 (Ala. 1987).

In this context, "actual malice" means common law malice. In order for

Breden to prove "common law malice" she must submit evidence of "previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication and the like." <u>Hayes v. Wal-mart Stores, Inc.</u>, 953 F.Supp. 1334 (M.D. Ala. 1996) <u>citing</u>, <u>Fulton v. Advertiser Co.</u>, 388 So.2d 533 (Ala. 1980); <u>Kirby v. Williamson Oil Co.</u>, 510 So. 2d at 179 <u>quoting</u> <u>Willis v. Demopolis Nursing Home, Inc., supra</u>, at 1120. Common law malice also includes defamatory statements made with knowledge of their falsity or with reckless disregard as to whether they are false. <u>Barnett v. Mobile County Personnel Bd.</u>, 536 So.2d 46 (Ala. 1988).

Plaintiff Breden has provided evidence that Moretti, the store manager, would not listen to her when she tried to discuss with him her complaints of unfair treatment in the workplace and, on one occasion, Moretti banged his head against the wall while Breden attempted to talk to him, causing Breden to fear for her own safety. (Breden depo., pp. 21-22). Further, Plaintiff Breden provided evidence that, prior to Breden's termination, Moretti received three letters from co-workers basically all stating the same exact comments about how negative Breden was in the workplace. Moretti testified that he did not think it was odd that the three statements said the same thing. (Moretti depo., p.138). Later, these same individuals retracted their statements and stated they were told to write negative statements about Breden

only <u>after</u> her termination.  (See Moretti depo., p. 159 and Pl.'s Exs. 9-11).  Goggins also testified that she was instructed to obtain statements from Plaintiff Breden's co-workers by Moretti.  (Goggins Aff. ¶ 6).  The Court finds that there are genuine issues of material fact precluding summary judgment for  Defendant on Plaintiff Breden's defamation claim.  Accordingly, the Defendant's motion for summary judgment as to Plaintiff Breden's defamation claim is due to be denied.

2.  **<u>Negligent Hiring, Training, Supervision and Retention</u>**

Plaintiff Breden has alleged negligent hiring, training, supervision, and retention with respect to the employment of Dillard's employees.[20]

In order to prevail on a claim of negligent hiring, Plaintiff Breden must prove that there was something in the background of the Dillard's employees that would have allowed Dillard's to know of their propensity to commit the acts of which she complains.  <u>Brown v.Vanity Fair Mills, Inc.</u>, 277 So. 2d 893 (Ala. 1973).  Plaintff Breden has not produced any evidence that there was something in the background of any of the Dillard's employees that would have given Dillard's notice, prior to their hiring, that they would commit any of the acts of which they are accused in this case.  Accordingly, the Court finds that Plaintiff Breden has presented no evidence to support her claim of negligent hiring and the Defendant's summary judgment

---

[20] Although Plaintiff Breden does not name any specific employees in her complaint with respect to these claims, it appears that she is speaking primarily of Moretti, Goggins, and Davis.

motion should be granted.

In regard to Plaintiff Breden's claim of negligent retention, Alabama law requires an employer to "use due care to avoid the ... retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." Brown v. Vanity Fair Mills, Inc., 277 So.2d 893, 894 (Ala. 1973).   For a master to be held liable for its servant's incompetency, it must be affirmatively shown that, had the master exercised due and proper diligence, the master would have learned of incompetency.   This showing  may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.  Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885 (Ala. 1995). To recover for negligent retention in Alabama, a plaintiff must show breach of that duty and that such breach proximately caused the plaintiff's injury.  Patterson v. Augat Wiring Systems, Inc., 944 F. Supp. 1509, 1529 (M.D. Ala. 1996).  Isolated incidents of negligence by the employee will not suffice to create a duty to terminate the problem employee.

> Negligence such as unfits a person for service, or such as renders it negligent in a master to retain him in the employment, must be habitual, rather than occasional, or of such a character as to render it imprudent to retain him in service.  A single exceptional act will not prove a person incapable or negligent.

Bank of Montgomery v. Chandler, 39 So. 822, 828 (Ala. 1905).  The Court finds that Plaintiff Breden has not presented any evidence to support her claim of negligent retention.  Accordingly, the Defendant's motion for summary judgment as to Plaintiff Breden's negligent retention claim is due to be granted.

In order to prevail on a claim of negligent supervision, Breden must demonstrate "by affirmative proof that the alleged incompetence of the [problem] employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence."  Portera v. Winn Dixie of Montgomery, Inc., 966 F. Supp. 1418, 1438 (M.D. Ala. 1998)(citing Ledbetter v. United Am. Ins. Co., 624 So. 2d 1371 (Ala. 1993)).  In addition, Breden must prove that, at the time of the complained-of conduct, the allegedly incompetent employee was acting within the line and scope of his employment.  Nash v. Segars, 682 So. 2d 1364 (Ala. Civ. App. 1996).  It is an essential element of a negligent supervision claim that the employer or principal have actual or constructive knowledge of the offending conduct or tort committed by his employee or agent.  Pescia v. Auburn Ford- Lincoln Mercury, Inc., 68 F. Supp. 2d 1269, 1280 (M.D. Ala. 1999).  See also Portera, 996 F. Supp. at 1439 (without evidence of prior complaints of sexual harassment, there was no evidence from which the employer could know that the supervisor created a hostile working environment).

46

It is clear that Dillard's did not have any knowledge of the acts alleged against the Dillard's employees.  Breden complained about the issues she had with the operation of the Men's Shoe department but she never reported any harassment by any of Dillard's employees.  Moreover, there is no evidence to suggest that, had Dillard's exercised due diligence, it would have ascertained that the Dillard's employees were allegedly harassing Plaintiff Breden.  Furthermore, there is no evidence that, had any of the employees at Dillard's been trained differently, Breden would not have been subjected to the same alleged harassment.  Dillard's had no way of knowing, without complaints from Breden, that any inappropriate conduct occurred.  Accordingly, the Court finds that the Defendant's motion for summary judgement as to Plaintiff Breden's claim of negligent supervision is due to be granted.

## V. Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment is **DENIED** in part and **GRANTED** in part as to Plaintiff Breden's discrimination, retaliation, and state law claims.

**DONE** and **ORDERED** this 9th day of September, 2005.

**VIRGINIA EMERSON HOPKINS**

United States District Judge